1
2
3
4
5
6
7

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

CHA HER,                                                    No. CIV S-08-1922-CMK

        Plaintiff,

   vs.                                                    <u>MEMORANDUM OPINION AND ORDER</u>

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.

_____/

       Plaintiff, who is proceeding with retained counsel, brings this action for judicial

review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).

Pursuant to the written consent of all parties, this case is before the undersigned as the presiding

judge for all purposes, including entry of final judgment.  <u>See</u> 28 U.S.C. § 636(c).  Pending

before the court are plaintiff's motion for summary judgment (Doc. 20) and defendant's cross-

motion for summary judgment (Doc. 22).

**I.  PROCEDURAL HISTORY**

       Plaintiff applied for social security benefits on October 29, 2002.  In the

application, plaintiff claimed that his disability began on March 8, 2002.   Plaintiff claims that his

disability is caused by a combination of left eye problems - face wounded, joint pain, right wrist

pain, right shoulder pain, right hand numb, back pain, depression, poor concentration, and poor

memory.  Plaintiff's claim was initially denied.  Following denial of reconsideration, plaintiff

requested an administrative hearing, which was held on November 6, 2003, before

Administrative Law Judge ("ALJ") Antonio Acevedo-Torres.  In a December 22, 2003, decision,

the ALJ concluded that Plaintiff was not disabled based on the following findings:

1.     The claimant has not engaged in substantial gainful activity since March 8, 2002.

2.     The medical evidence establishes that the claimant has severe status post gunshot wounds to the face, left eye visual loss and an anxiety disorder, but that he does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulation No. 4.

3.     The claimant's testimony is not credible for the reasons stated in the body of the decision.

4.     The claimant has the residual functional capacity to perform the exertion requirements of work except for frequently lifting more than 25 pounds and occasionally lifting more than 50 pounds (20 CFR 404.1545).  He is also precluded from working in high stress environments, frequently socially interacting with the public and handling large objects, using power tools, working on an assembly line and working in hazardous environments.

5.     The claimant has the  residual functional capacity to perform medium work eroded by visual, environmental and mental impairment related nonexertional limitations (20 CFR 404.1567).

6.     The claimant is unable to perform his past relevant work.

7.     The claimant is 41 years old, which is defined as a younger age individual (20 CFR 404.1563).

8.     The claimant has a high school education (20 CFR 404.1564).

9.     In view of the claimant's age and residual functional capacity, the issue of transferability of work skills is not material.

10.     Section 404.1569 of Regulations No. 4 and rule 203.29 of Table No. 3, of Appendix 2, Subpart P, Regulations No. 4, direct a conclusion that, considering the claimant's residual functional capacity, age, education, and work experience, he is not disabled within the framework of this rule.

/ / /

11.    The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR 404.1520(f)).

(Certified Administrative Record ("CAR") 19).

After the Appeals Council declined review on March 29, 2004, Plaintiff filed an appeal with this court, case number 04cv1014-KMJ.  The parties entered in to a stipulated remand, wherein the parties agreed that the ALJ was to "obtain vocational expert testimony to clarify the effects of Plaintiff's assessed limitations on the occupational base."  (CAR 267-70).  In addition, the ALJ was directed to consolidate Plaintiff's current and subsequent claims, which were filed on May 27, 2004, and issue a new decision.

Following the stipulated remand order, the Appeals Council directed the ALJ to consult with a vocational expert and articulate Plaintiff's high stress environment restrictions.  In addition, the Appeals Council noted that "the State Agency concluded that the claimant became disabled on June 1, 2004," based on his May 27, 2004, subsequent application.  (CAR 277).  The ALJ was therefore directed to consider only the period prior to June 1, 2004, and to consult with a mental health medical expert in determining whether an earlier onset date is possible.  The ALJ was further directed to offer Plaintiff a new hearing and address any additional evidence submitted.  (CAR 276-77).

A new administrative hearing was held November 2, 2005.  In a December 27, 2005, decision, the ALJ again concluded that Plaintiff is not disabled based on the following findings:

1.    The claimant has not engaged in substantial gainful activity since March 8, 2002.

2.    The medical evidence establishes that the claimant has severe status post gunshot wounds to the face, left eye visual loss and an anxiety disorder (posttraumatic stress disorder), but that he does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulation No. 4.

/ / /

3

3.   The claimant's testimony is not credible for the reasons stated in the body of the decision.

4.   The claimant has the following residual functional capacity: the claimant remains capable of lifting 50 pounds occasionally and 25 pounds frequently.  Therefore, he remains capable of performing medium work.  However, he is further restricted to performing unskilled work where no bilateral visual acuity is required.  The claimant must also avoid working with large objects, power tools and he is unable to perform assembly work.

5.   The claimant is unable to perform his past relevant work.

6.   The claimant is 43 years old, which is defined as a younger age individual (20 CFR 404.1563).

7.   The claimant has a high school education (20 CFR 404.1564).

8.   In view of the claimant's age and residual functional capacity, the issue of transferability of work skills is not material.

9.   Pursuant to the testimony of the vocational expert, Ms. Clavel, given the above residual functional capacity and considering the claimant's age, education and past relevant work experience, the claimant would be able to perform the following jobs which exist in significant numbers in the national economy: An auto detailer. See Dictionary of Occupational Titles 915.687-034.  There are 120,000 jobs in the United States and 10,000 jobs in California. The claimant could also work as a laundry factory worker with 2,400 jobs in California and 10,000 jobs in the United States.  See Dictionary of Occupational Titles 361.687.018.  The claimant could also work as a dishwasher with 37,000 jobs in California and 400,000 in the United States.  See Dictionary of Occupational Titles DOT 599.687-030.  At the light level, the claimant could work as an usher in a theater.  There are 6,700 jobs available in California and 57,000 jobs in the U.S.  See Dictionary of Occupational Titles 344.677-014.  He could work as a storage facility clerk.  There are 5,800 jobs in [] California and 55,000 jobs in the United States.  See Dictionary of Occupational Titles 295.367-026.  He could also work as a mail clerk.  There are 79,000 jobs in the U.S. and 7,800 in California.  See Dictionary of Occupational Titles 209.687-026.  At the sedentary level, the claimant could work as a food order clerk.  There are 17,000 jobs available in the United States and 12,000 in California.  See Dictionary of Occupational Titles 209.567-014.  He could work as a telephone information clerk.  See  Dictionary of Occupational Titles 237.367-046.  There are 93,000 jobs available in the U.S. and 12,000 jobs in California.  Finally, he could work as a charge account clerk.  See Dictionary of Occupational Titles 205.367-014. There are 38,000 jobs in the U.S. and 4,000 jobs available in California.

10.    Within the framework of Section 404.1569 of Regulations No. 4
       and rule 203.29 of Table No. 3, of Appendix 2, Subpart P,
       Regulations No. 4, direct a conclusion that, considering the
       claimant's residual functional capacity, age, education, and work
       experience, he is not disabled within the framework of this rule.

11.    The claimant was not under a "disability," as defined in the Social
       Security Act, from his alleged onset date of March 8, 2002 through
       the end of May of 2004.  However, as noted above, the claimant
       submitted a subsequent application dated May 27, 2004 while the
       current application was pending on appeal and at this time, as
       ordered by the Appeals Council, the undersigned will not disturb
       the determination that the claimant was disabled as of June 1, 2004
       (20 CFR  404.1520(f)).

(CAR 255-56)

Following Plaintiff's appeal of that decision to the Appeals Council, on June 18,

2008, the Appeals Council issued a denial stating it found no reason to assume jurisdiction.  This

appeal followed.

## II.  SUMMARY OF THE EVIDENCE

The CAR contains the following evidence, summarized chronologically below:

1.    Medical Records, U.C. Davis Medical Center, March 12, 2002 through
      August 7, 2002(CAR 109-55);

2.    Medical Records, We Care Medical Center, August 22, 2002 through
      February 7, 2003 (CAR 156-64);

3.    Internal Medicine Consultative Examination, James L. Martin, M.D.,
      December 30, 2002 (CAR 165-67);

4.    Psychiatric Evaluation, Andrea Bates, M.D., December 28, 2002 (CAR
      168-74);

5.    Medical Consultant's Review of Physical Residual Functional Capacity
      Assessment, January 14, 2003 (CAR 175-82);

6.    Psychiatric Review Technique Form, DDS physician, January 16, 2003
      (CAR 183-96);

7     Psychiatric Review Technique Form, DDS physician, April 30, 2003
      (CAR 197-210);

8.    Medical Assessment of Ability to Do Work-Related Activities (Mental)
      April 30, 2003 (CAR 211-14);

/ / /

5

9.  Medical Records, We Care Medical Center, May 28, 2003 through October 16, 2003 (CAR 218-22);

10. Medical Assessment of Ability to Do Work-Related Activities (Mental) from Wu-Hsiung Su, M.D., November 1, 2003 (CAR 223-24);

11. Medical Assessment of Ability to Do Work-Related Activities (Physical) from Wu-Hsiung Su, M.D., November 1, 2003 (CAR 225-26);

12. Medical Records, Sacramento Community Health Center, December 23, 2003 through July 9, 2004 (CAR 292-304);

13. Medical Records, Sacramento County Mental Health, June 23, 2004 through September 7, 2005 (CAR 305-25);

14. Psychiatric Review Technique Form (Medical Expert) November 2, 2005 (CAR 326-41);

**A.     TREATMENT RECORDS**[1]

<u>2002</u>

Plaintiff summarizes his treatment at U.C. Davis Medical Center as follows:

> On March 8, 2002, Mr. Cha Her was shot in the face during an attempted robbery.  He was taken to U.C. Davis Medical Center by ambulance.  His diagnoses were: left orbital fracture; left mandibular fracture; left visual field loss; left maxillary sinus fracture; and status post gunshot wound x 2 to face. TR 138. Radiological evidence documented:

> > multiple bullet fragments superimposed on the mandible bilaterally, as well as over the left maxillary sinus.  There is a comminuted fracture of the body of the left mandible, with multiple fracture fragments interspersed with shrapnel. This results in a fairly large defect of the left mandible, although the roots of the teeth are not involved.

> TR 145.

> During the hospitalization he underwent surgery to extract a right submandibular foreign body.  TR 155.  Mr. Her was seen by multiple physicians and psychiatry.  He was advised to continue the Remeron and contact Victims of Violent Crime.  TR 137.  Mr. Her was discharged on March 13, 2002, and instructed to follow-up with Ophthalmology and the Trauma Clinic.  TR 137-138.

(Pl.'s Mot. at 4-5).

---

[1]     A significant amount of the treatment notes are illegible.  The court has interpreted them where possible, and has relied in large part on the summary Plaintiff provides.

1          Plaintiff summarizes his treatment at We-Care Medical Center, which the court

2   notes contain the most illegible notes, as follows:

3               On August 22, 2002, Mr. Her reported neck and shoulder
     pain, and memory lost. The notes reflected that his left eye was
4    blind and that he had severe pain. TR 163.

5               On September 19, 2002, Mr. Her reported eye problems. He
     was assessed with status post gunshot wound. TR 162.
6
               On October 28, 2002, he reported neck, shoulder, and back
7    pain. It was noted that his left eye was blind. He was prescribed
     Vioxx and Tylenol. TR 161.
8
               On December 6, 2002 he reported that he was tired, had
9    headaches, body pain, and mental problems.  Insomnia, headaches,
     and fearfulness were noted.  He was assessed with PTS (Post
10   Traumatic Stress) as the victim of an assault. TR 160.

11  (Pl.'s Mot. at 5).

12      2003

13              On January 7, 2003, he reported body pain and mouth
     bleeding. He was assessed as blind in left eye and referred to
14   Ophthalmology.

15              On February 7, 2003, he reported back pain and an inability
     to sleep. He was given an eye referral. TR 158.
16
               On May 28, 2003, Mr. Her was seen in follow-up for pain
17   on the left side of his face. He was assessed with headaches
     secondary to gunshot wound. TR 222.
18
               On June 26, 2003, Mr. Her reported back and eye pain. Left
19   eye was termed "abnormal" with some tenderness. He was
     assessed status post gun shot injury to left eye with persistent pain.
20   TR 221.

21              On October 16, 2003, he reported left face pain and was
     assessed with gunshot [wound] to left eye – blind.
22  (Pl.'s Mot. at 5).

23              Plaintiff was seen on December 23, 2003, for medication refill.

24      2004

25              On June 11, 2004, Mr. Her was treated for headaches
     secondary to his gunshot wound.  He was also assessed with
26   anxiety and depression.  The records reflected that he was

prescribed Feldene, Neurontin, and Elavil, and was to be referred
to the psychiatrist. TR 298, 304.

    On July 9, 2004, Mr. Her reported that his wrist and brain
were hurting. He was assessed with low back pain, right wrist pain
and neck pain, as well as depression. TR 294. Mr. Her's problems
were listed as blindness, body aches and depression. His
medications were Elavil, Neurontin, and Feldene. TR 293.
(Pl.'s Mot. at 5-6)

<u>2004-2005</u> (Sacramento County Mental Health Services)[2]

    Sacramento County Adult Mental Health Services
(SCAMHS) medical records of June 23, 2004, reflected that Mr.
Her underwent an initial psychiatric evaluation. His reliability was
rated as good and he required an interpreter. He reported that his
chief concern was feeling worthless caused by having to depend on
others. He also stated that he was frequently fearful and sensitive
to loud noises. He identified his problems starting after suffering
multiple gunshot wounds in 2002. He also expressed that he was
scared of groups of Hispanics because his unprovoked attack was
perpetrated by a Hispanic person. Mr. Her further reported
recurring dreams on a nightly basis which made it difficult to sleep.
He stated that his girlfriend had been nice to him but he felt very
inadequate due to not being able to work.

> Currently he is negatively affected by the depression and
> the injuries from the multiple gunshot wounds. States that
> the depression makes him not want to do anything and he
> has lost a great deal of interest in his pets. Has to force
> himself to be active. Has a gun at home and has had
> thoughts of suicide but is hopeful that he'll get better.
> States that the gun is locked and none of the children are
> depressed.
>
> The patient now feels that the depression has gotten worse
> over time. All money is gone and he is frustrated over the
> SSI process.
>
> The patient reports that before the gunshot wound he had
> no past history of depression or mental illness.

TR 321.

    Mr. Her reported that he was unable to drive any more
because he had two accidents. He further indicated that he has

---

[2]     Plaintiff's summary of these records are included here as they are contained in the
record. However, the undersigned notes that the issues in this case are limited to the time frame
of March 8, 2002 through June 1, 2004, as Plaintiff has already been determined to be disabled as
of June 1, 2004, in response to his supplemental application.

constant headaches and back pain and blindness in the left eye.  TR 322.  The evaluation reflected that Mr. Her's walking was labored and he used a cane.  He further expressed feelings of hopelessness and uselessness.  He stated that he sleeps about five hours per night and has hyper startle to loud noise and traumatic dreams of the shooting.  Mr. Her had also lost his sexual drive and that is negatively affecting the relationship.  TR 323.  The plan was to "decrease the depression with Wellbutrin due to concern over worsening already suppressed sexual feelings and treat the PTSD with Seroquel.  TR 324.  Medical records of the same day reflected that Mr. Her was prescribed Wellbutrin, Seroquel and Viagra.  TR 319.  Medical records also reflected a DMS-IV diagnosis of:

| | | |
|---|---|---|
| Axis I: | Post-traumatic Stress Disorder. | |
| | Major depression single episode. | |
| Axis II: | None. | |
| Axis III: | Jaw pain, tongue numbness, headaches, right leg numbness, all secondary to multiple gunshot wounds. | |
| Axis IV: | Acute and chronic problems with his primary support group and economic conditions. | |
| Axis V: | Current GAF: 48. Past Year: 55. | |

TR 324.

On July 22, 2004, Mr. Her reported sleeping a little better but still being depressed; reported that the Seroquel helped but that he was still awakened every two hours with traumatic dreams; and that Wellbutrin caused him agitation.  He also reported PTSD symptoms.  His Wellbutrin was decreased and Restoril was added to the Seroquel.  His medication compliance was rated as always/almost always, and his overall response to medication was rated partial, adequate.  TR 318.

On August 11, 2004, Mr. Her reported still feeling fearful, still having a loss of sex drive, being easily startled by loud noises, and having decreased sleep and anhedonia.  He also reported that he had constant headaches, back pain, and was still unable to drive a vehicle.  The records reflected that he had a current GAF of 48.  TR 317.

Treatment notes dated August 17, 2004, reflected that Mr. Her was attempting to apply for the Victim's Compensation Benefits.  The psychiatric staff believed that he needed long-term counseling.  TR 316, 317.

On September 2, 2004, Mr. Her reported: "I am no better."  The patient reports a marginal improvement in his sleep but even the addition of Lexapro to the Wellbutrin was not helpful.  The patient reports that he feels anxious and fearful.  States his anxiety gets better and worse.  Has also

[has] panic attacks.  States the panic attacks occur more when he leaves home.  Nightmares still occurring every night.

TR 315.  The remarks included: "Still despondent and having marked panic anxiety problems." TR 315.

On October 28, 2004, Mr. Her reported sleeping too much and getting really tired, and hearing noises.  He reported that his sleep was too heavy on his current medications and he got up at 6:00 a.m. and then went back to bed until 10:00 a.m.  Reported that he seemed to see shadows coming at him with a gun and saw the shadow even more when he did not take his medication.  He indicated that the shadow brought on anxiety attacks and that he was very sensitive to the feeling of being threatened.  He said he was depressed over problems with his relationship and felt that his girlfriend was more concerned about money than him.  He also reported having thoughts of suicide but no intent as his girlfriend had hidden the guns.  The record reflected that his medication compliance was always/almost always, side effects were that he was sedated, and his overall response to medication was partial, inadequate.  TR 314.

On December 13, 2004, Mr. Her felt like a one out of ten if ten was the best.  He reported being upset that he was unable to earn money, upset with his wife's kids, and still thought about suicide.  Cymbalta was started and Lexapro and Wellbutrin discontinued.  His medication compliance was rated always/almost always, and his overall response to medication was rated partial, inadequate.  He was continued on Restoril and Seroquel.  TR 312.

On January 26, 2005, Mr. Her reported a good response to Viagra.  The records indicated that he was very concerned about the possible loss of Medi-Cal.  His Cymbalta was increased and Seroquel was discontinued.  His medication compliance was rated always/almost always, and his overall response to medication was rated partial/adequate.  TR 311.

On March 9, 2005, Mr. Her reported "I had a severe nightmare last night most of the night."  He reported that his nightmares were intermittent and his sleep was very light.  He stated that he felt Cymbalta made him feel calmer and rated his mood at five/ten.  He denied family stresses and his daily activities included raising chickens and participating in the child rearing.  The record reflected that because Mr. Her was depressed for approximately two years before coming to SCAMHS it might take another two months to see a full response.  His medication compliance was rated always/almost always, and his overall response to medication was rated partial, inadequate.  TR 310.

///

10

The SCAMHS Annual/Update Medication Services Plan dated May 18, 2005, reflected that Mr. Her had been treated for depression since June of 2004. "He has been severely depressed subsequent to a disabling gunshot injury in 2002. Initially he was treated with Lexapro and Wellbutrin without success and now had a good response to Cymbalta. Sleep has been improved on Seroquel. He feels the Viagra has helped his marriage. Rates his mood now at six to seven if ten is best. The staff reported that his mood and affect were much improved and he enjoyed raising his chickens and felt that without the chickens his life would be miserable. His medication compliance was rated at always/almost always and his overall response to medications was rated as complete. TR 308.

On the same day, his DSM diagnosis was:

| | |
|---|---|
| Axis I: | PTSD. |
| | Major depression single episode. |
| Axis II: | None. |
| Axis III: | Gunshot wound causing pain and problems with ambulation and vision. |
| Axis IV: | Acute and chronic problems with primary support, education, and economic problems. |
| Axis V: | Current 60; Past 60. |

Improved and stabilization is good . . . still re-experiencing the event by feeling someone will break into the house. Also tends to see the perpetrator out of the left side of his field of vision. States he startles easily. Always feels that people walking toward him are potential attackers.

Annual medication care plans and goal review: Continue Cymbalta, Seroquel and Viagra. See if Ability will dampen his hyper-reactivity from the PTSD.

TR 307.

On July 9, 2005, Mr. Her was seen for major depression accompanied by physical pain from his gunshot wound. He rated his mood at six/ten and reported that he was less worried. He reported that during the day he typically went outside and took care of his chickens. He also indicated that he just returned from a visit with his family in Wisconsin and was able to enjoy it. His progress toward rehabilitation was regarded as limited due to limited vision caused by the gunshot wound and the overall assessment was that he was doing well. His medication compliance was rated always/almost always and he was experiencing no side effects and his overall response to medications was considered partial/adequate. TR 306.

On July 11, 2005, Mr. Her was approved for Cymbalta pharmacy prescription. TR 305.

11

1                     On August 8, 2005, and September 7, 2005, Mr. Her's
                treatment focused on his laboratory work in regard to his Seroquel

2                  dosage. TR 305.

3  (Pl.'s Mot. at 6-10).

4        **B.**      **EVALUATIONS**

5        <u>Internal Medicine Consultative Examination, Dr. Martin, December 30, 2002</u>

6                     Plaintiff reported his chief medical complaint was vision loss following an assault

7  in March 2002 wherein he was shot in the left side of his face.  He required emergency care and

8  facial surgery, but lost the vision in his left eye.  He also had minimal cosmetic sequelae.  He

9  reported he continues to have pain in his face due to bullet fragments remaining within, and that

10  the pain sometimes extends to his neck and shoulders.  Dr. Martin did not have Plaintiff's

11  medical records, except a one page clinic note from October 2002.  On examination, Dr. Martin

12  found Plaintiff to be grossly euthymic, and noted Plaintiff had no obvious difficulty moving

13  about the office.  Plaintiff's uncorrected vision was "OD: 20/80  OS: >20/200 ('I see black')."

14  (CAR 166).  Dr. Martin noted that Plaintiff's "[c]ooperation was fair with grimacing and pain

15  vocalization not noted casually."  (CAR 166).  Plaintiff had normal range of motion, "was able to

16  squat fully, but reported it provoked lumbago.  Seated and supine sciatic tension testing was

17  negative bilaterally.  There was no obvious palpable paraspinous spasm."  (CAR 166).  Dr.

18  Martin also noted that there were no obvious muscular asymmetry or atrophy.  Plaintiff's gait

19  was grossly normal, he was able to walk on his heels and toes, his motor tone was grossly

20  normal, and "finger-to-nose intact bilaterally although he found it challenging."  (CAR 167).

21  Plaintiff's grip strength was 5/5 bilaterally.

22                     Dr. Martin's assessment was: (1) Unilateral vision impairment; (2)

23  Musculoskeletal complaints of unknown significance.  "Based on the objective findings and

24  available information at the time of [the] examination, [Dr. Martin found] no functional

25  restrictions attributable to medical conditions apart from his vision impairment."  (CAR 167).

26  / / /

Psychiatric Evaluation, Dr. Bates, December 28, 2002

At this psychiatric evaluation, Plaintiff reported his chief complaint was "I have a gunshot at my face and made me mental." (CAR 168). Dr. Bates did not have medical records, but did have some background information which was reviewed. Plaintiff reported he had impaired vision due to being shot, decreased memory after the incident, and some depression. He also reported "nightmares of the shooting every night and increased startle response as well as flashbacks." (CAR 169). He also "avoids situations or circumstances or things that remind him of the shooting." (CAR 169). Plaintiff reported no psychiatric hospitalization, no suicide attempt, and no psychiatric treatment.

Dr. Bates reported his current level of functioning is as follows:

> The claimant lives with his family. He takes care of self-dressing, self-bathing, and personal hygiene. He does household chores, errands, shopping and cooking. The claimant can manage his funds and pay bills. He spends the day occasionally vacuuming. He will also try to walk outside a little bit. Claimant also attends appointments that he has to go to, but he stated that he usually is scared to go alone and is accompanied by his girlfriend. The claimant gets along with family members. He does have close friends. He has no problems with neighbors. (CAR 170).

She reports that Plaintiff was able to recall two of three objects immediately, and one of three objects after several minutes. Plaintiff's concentration was not fully intact. He was not able to repeat five digits forwards or three backwards, was not able to accurately subtract three from twenty in a serial fashion, was able to add and subtract simple terms only. However, his abstractions were intact, insight and judgment were fair, and his fund of knowledge was fair to poor. His mood was a bit frustrated but not overwhelmed. "He was not profoundly depressed. He was a bit anxious. Affect was constricted." (CAR 171).

Dr. Bates stated Plaintiff's diagnosis was post traumatic stress disorder, and his current global assessment function scale was 55-62. She stated his functional assessment as:

> 1.     Not significantly impaired in his ability to understand, remember, and carry out <u>simple</u> one or two-step job instructions.

2.     Not significantly impaired in his ability to do detailed and
       <u>complex</u> instructions.
3.     Not significantly impaired in his ability to relate and
       interact with supervisors, coworkers, and the public.
4.     Not significantly impaired in his ability to maintain
       concentration and attention, persistence and pace.
5.     Not significantly impaired in his ability to associate with
       day-to-day work activity, including attendance and safety.
6.     Moderately impaired in his ability to adapt to the stresses
       common to a normal work environment.
7.     Not significantly impaired in his ability to maintain regular
       attendance in the work place and perform work activities on
       a consistent basis.
8.     Not significantly impaired in his ability to perform work
       activities without special or additional supervision.

(CAR 172-73).  She further stated that "[f]rom a psychiatric perspective, the claimant has a good

prognosis for returning to the workforce at some point."  (CAR 173).

Physical RFC, January 14, 2003

An agency physician, Dr. Pong, reviewed the record and determined Plaintiff had

the ability to lift and/or carry 50 pounds occasionally, 25 pounds frequently; stand and/or walk

about six hours in an eight-hour day; sit about six hours in an eight-hour day; unlimited ability to

push and/or pull; no postural limitations; no manipulative limitations; visual limitations in depth

perception and field of vision, with the additional limitations to avoid handling very large

objects, power tools or working on assembly line; must avoid exposure to hazards due to vision

only in one eye.  Dr. Pong noted these opinions differ from treating/examining source

conclusions, noting "Claimant still has residual pain R wrist R shoulder R hand back and jaw

from 3-02 assault and is blind OS M RFC with visual limitations is more appropriate."  (CAR

181).

Psychiatric Review Technique Form, DDS physician, January 16, 2003

Agency physician found no medically determinable impairment due to anxiety

related disorders, with notation of recurrent and intrusive recollections of traumatic experience,

which are a source of marked distress.  It was noted that the mere presence of a diagnosis is not

enough, that the diagnosis must cause a disability "(read "dis-ability"); ie impairment.  Here, the

1   impairment is physical (ie visual) & there is no [psychiatric] impairment (see 12/28/02

2   [psychiatric] CE MSS)."  (CAR 188).  The reviewer found no functional limitations exist as a

3   result of Plaintiff's mental disorder.

4         Psychiatric Review Technique Form, DDS physician, April 30, 2003

5           A second agency physician, Dr. Tyl, found that an RFC assessment was necessary,

6   and there were coexisting nonmental impairments that required referral to another medical

7   specialty, noting anxiety-related disorders.  Dr. Tyl noted "PTSD per CE & TP" as a medically

8   determinable impairment present that does not precisely satisfy the diagnostic criteria under

9   affective disorders.  (CAR 200).  Dr. Tyl found Plaintiff to have mild limitations in his activities

10  of daily living and maintaining concentration, persistence, or pace; moderate limitations in his

11  ability to maintain social functioning; and insufficient evidence regarding any episodes of

12  decompensation.  She further noted the evidence does not establish the presence of the "C"

13  criterion.  She specifically references a consult from April 30, 2003.

14        Mental RFC, April 30, 2003

15          Agency physician, Dr. Tyl, also completed this mental RFC.  She found Plaintiff

16  not significantly limited in all categories, except moderately limited in his ability to interact

17  appropriately with the general public.

18        Medical Assessment of Abilities (Mental), Dr. Su, November 1, 2003

19          Plaintiff's treating physician, Dr. Su, completed the assessment form, noting

20  Plaintiff's abilities in all categories as either "fair" or  "poor or none" due to his depression, pain

21  and weakness.  Dr. Su rated Plaintiff's abilities as fair in the following categories: use judgment;

22  understand, remember, and carry out detailed, but not complex, job instructions; understand,

23  remember and carry out simple job instructions, maintain personal appearance, and demonstrate

24  reliability.  He rated Plaintiff's abilities as poor or none in the following categories: follow work

25  rules; relate to co-workers; deal with the public; interact with supervisors; deal with work

26  stresses; function independently; maintain attention/concentration; understand, remember and

carry out detailed, complex job instructions; behave in an emotionally stable manner; and relate predictably in social situations.

Medical Assessment of Abilities (Physical), Dr. Su, November 1, 2003

Dr. Su also found Plaintiff's physical abilities to be limited.  He notes the "medical findings" supporting his assessment include Plaintiff's pain, weakness, depression and left eye blindness.  He limited Plaintiff's lifting/carrying abilities to less than five pounds frequently, up to ten pounds occasionally; standing/walking abilities to two hours total in an eight-hour day with only one hour without interruption; and his sitting abilities to four hours in an eight-hour day with only two hours uninterrupted.  He found Plaintiff had postural limitations to the extent he could never balance, and only occasionally bend, climb, stoop, crouch, crawl, or kneel.  He was also had impaired abilities to reach, handle, feel, push/pull and see, but not in his ability to hear or speak.  Dr. Su further noted environmental restrictions as to heights, moving machinery, humidity and vibrations, but not to chemicals, dust, noise, or fumes.

**C.    HEARING TESTIMONY**

Two administrative hearings were conducted; the first was on November 6, 2003, the second was on November 2, 2005.  Plaintiff testified at both hearings, with the help of an interpreter at the second hearing.  Also at the second hearing, vocational expert Susan Creighton-Clavell and medial expert Dr. Sidney Walter both testified.

Plaintiff's 2003 Testimony

At the first administrative hearing, Plaintiff testified without an interpreter.  He testified that he finished high school and then worked in electronics and testing.  He stopped working due to his injury in March 2002.  He sees the doctor every month and takes four types of medication for pain, sleeping, and headaches.  His pain is in his left eye.  He sleeps from seven to eight hours at night, interrupted every two hours, and takes naps during the day due to his medication.  He testified he lives with his girlfriend but no children.  He no longer goes camping, hunting, fishing or dancing since his injury.  He stated he can walk maybe two blocks.  Any

further than that and his back hurts and his legs become weak.  He can stand for about twenty minutes and sit for about an hour before he has to switch positions.  He does not carry anything due to the pain in his back.  The pain medication he takes is for both his eye and his back.

He spends his morning staying home watching television.  His girlfriend takes care of all the cooking, housework, laundry, and dishes.  In the afternoon he takes a little walk then returns to sleep.  He also testified that he suffers from pain in his neck, shoulder, and jaw since being shot.  He also has headaches since the gunshot.  His doctor prescribed a cane for him to use when he was released from the hospital due to his limited eyesight, as he is blind.

Plaintiff's 2005 Testimony

At the second administrative hearing, Plaintiff testified through a Hmong interpreter.  He testified he finished high school in Stockton.  In the past he "worked for technicians, test operator for Billboard Testing and I do drilling fixture and drilling billboard testing."  (CAR 345).  He lost his vision after being shot.  He sees three types of doctors: chiropractor, family doctor, and mental health doctor.  His medications include Seroquel, Zopota [sic], and Tylenol.  He takes the Tylenol for pain as needed.  If he does not "take medication I cannot fall asleep because I see somebody come all the time.  So I cannot sleep all night."  (CAR 349).  With medication, he sleeps about five hours.  He does not take naps because with nobody at home, he is scared.  He lives with his girlfriend and her five children.  They all go to school.

Plaintiff has a driver's license and a car, but only drives maybe ten miles per week because he is too scared to drive by himself.  He does not drive himself to the doctors because it is too far.  He can only walk about one block then has to rest.  He can stand for about ten minutes, and sit for about fifteen then has to get up.  Since he got hurt, he cannot lift anything.  Prior to his injury he could only lift five to ten pounds.  His outdoor activities consists of helping raise twenty to thirty chickens; he helps feed them which takes about five to ten minutes.  He also helps with one dog.  In the morning he showers, feeds the chickens, then comes back inside to sit down.  The chickens are close to the house, about 100 yards away.  He does not do the dishes,

cooking, laundry or any housework.  He will sometimes watch television for about twenty minutes, but does not read.  In the evenings, after the kids come home, he tells them to study and do their homework.  He does not help them, just tells them to do it.  He cannot see and read.

In order to do his previous job, he needed good vision because he used a drill bit that was very small.  He also was required to take measurements to make sure he was using the right drill bit.  His depth perception is now mixed up.  In his previous job, he had to sit down, stand up, and walk around.  He used four different machines, and had to walk back and forth to get material and change drill bits.  He received on the job training, which took about three months.

When the weather is raining or sunny, he feels pain on the side of his face.  It gets very hot.  He was shot by a person unknown to him.  He and his family went to take a picture, a guy walked by and asked for a quarter.  Plaintiff stated he did not have a quarter, so the person pointed a gun at him and shot him.  The bullet is still in his face.  He has pain on the left side of his face, including his nose, and it is still numb.  He also has pain in his neck, back, and wrist.  He also has ringing in his ear, which bothers him.

He has to take medication to go to sleep about once a week.  It will sometimes leave him drowsy in the morning.  He no longer drives because he is scared to.  He was in two accidents due to his limited vision.

After having been shot, he is scared to be alone.  He hears noises like somebody is coming.  He has to stay far away from strangers.  During the day when he is home he stays in the house.  He is scared to go out.  He is also scared of loud noises.

He uses a cane which he received following a surgery on his thigh for blood clot.  Still has pain in his leg and cannot stand up very long.

<u>Medical Expert 2005 Testimony</u>

At the second hearing, the ALJ called Dr. Sidney Walter, a Psychologist, to testify as a medical expert (ME).  In addition to his testimony, Dr. Walter also completed a Psychiatric

Review Technique Form, wherein he opined that Plaintiff had no medically determinable impairment, "not A&B," noting that there were coexisting nonmental impairments.  This medical disposition was based on anxiety- related disorders, noted as "PTSD (mod)."  Dr. Walter also noted Plaintiff's dysphoric mood under affective disorders, but did not check the box.  Dr. Walter also noted, under evidence of affective disorder, that Plaintiff had sleep disturbance, which was corrected by medication, feelings of worthlessness, and difficulty concentrating or thinking.  Under anxiety-related disorders, Dr. Walter noted moderate recurrent recollections of traumatic experience, and moderate severity PTSD, including nightmares of shooting, flashbacks, and startle response.  As to Plaintiff's degree of limitation, Dr. Walter found Plaintiff had mild restriction of activities of daily living, mild to moderate difficulties in maintaining social functioning, moderate to marked difficulties in maintaining concentration, persistence, or pace, and one or two episodes of decompensation.  Dr. Walter further found Plaintiff had no limitation in his ability to understand, remember, or carry out short, simple instructions, or to interact appropriately with supervisors or co-workers; a slight limitation in his ability to respond appropriately to work pressures and changes in routine; and a moderate limitation in dealing appropriately with the public.  (CAR 326-41).

At the hearing Dr. Walter testified that he had reviewed Dr. Bates' assessment of December 2002.

> At that time, according to Dr. Bates, the claimant does household chores, he runs errands, he does shopping, he cooks, he pays his own bills, and he gets along with others.  And a simple test of memory was in tact, but his concentration was poor. [He was] classified as [having] a post-traumatic stress disorder, with a GAF 55 to 62, which means he has a moderate impairment, but not severe.  I read the exhibit today, and they classified him having major depression of single episode, a GAF of 60, which again is a moderate impairment, not severe.  I agree with the former, he has a post-traumatic stress disorder with symptoms of poor sleep with nightmares.  His concentration is affected somewhat.  He has I would say stoggled [phonetic] responses and some flashbacks.  But it's overall based on the activities he does and his testimony today, it would be moderate severity rather than severe.
> . . . .

His depression is more of a dysphoric mood rather than a pathological depression.  It's the mood that's low because of his injury and his lack of ability to continue work for a while, until he rehabilitates.  So I would say, it requires an MRFC because he doesn't meet A and B.  He meets A, and that is a post-traumatic stress disorder, but not B, which makes it more severe or would make it meet the listings.  In part B, . . .

. . .

Daily living would be mild based upon the record and testimony on Exhibit 5 primarily and his testimony today.  Social functioning I have mild to moderate because at least nine months after his accident he gets along with others.  I don't know what they mean by others, but at least that's the statement.  So I would rate it mild to moderate.  As far as concentration, persistence or pace, moderate to marked based upon a post-traumatic stress disorder and some degree of depression.  And decompensation there's only one.  And so he doesn't meet the criteria for B, so I recommended a MRFC.

. . .

He cannot do complex activities because of concentration and attention, but I think he understands and can do very simple tasks, one to three steps, but not detailed.  It [would] all have to be at a very basic level until he rehabilitates.

(CAR 368-69).

Upon questioning by Plaintiff's attorney representative at the hearing, regarding an exhibit, that was not in the record, dated September 11, 2004, Dr. Walter further testified that "[a]gain it says he can do his own shopping.  He can be able to do simple calculations.  I agree. It has to be simple type of activity.  He said he should be able to socialize with family and friends."  (CAR 370).

Dr. Walter agreed with the attorney's clarification that the report stated that Plaintiff stays home, lies down, and walks around, but he should be able to do his own shopping. The report also noted his GAF of 40 based on post-traumatic stress disorder.  A GAF of 40 is a

severe condition based upon primarily psychotic symptoms.  And I don't, I didn't picked up any information about psychotic symptoms in the reports I've read . . . including the late one today. . . . So I don't know what he's talking about.  As I said before, he's basing that the claimant may not be able to work because of post-traumatic stress disorder. . . . I would limit his work to very simple types of tasks that would not, did not require concentration,

1          attention beyond simple. . . . Which the other[s] agree with me,
including the last report submitted today."  (CAR 371-72).

2

3          As to Plaintiff's testimony that he suffers from being "afraid of people coming

4 [from] behind, flashbacks, etcetera," Dr. Walter agreed that those can be consistent with a

5 diagnosis of post-traumatic stress, and there was no reason to doubt Plaintiff suffers from those

6 symptoms.

7          Plaintiff's attorney and Dr. Walter then had a discussion about the B criteria and

8 the lack of any formal guidance as to what symptoms meet the B criteria.  Finally, Dr. Walter

9 testified that Plaintiff would have only a slight limitation in getting along with others, but once

10 he got to know his supervisor and co-workers, he would not be afraid of them.  It might be a little

11 traumatic for him at first, but once he adjusted, it would only be a slight factor.  There would be

12 more of a moderate factor as to his ability to relate to the public.

13      <u>Vocational Expert Testimony</u>

14          At the 2005 hearing, the ALJ called Susan Creighton-Clavell to testify as a

15 vocational expert (VE).  She testified that the way Plaintiff performed his past relevant work, as

16 Plaintiff testified, would be as an electronic tester.  She would classify that position as "light with

17 an SVP of 5, or skilled work."  (CAR 384).  His position as a circuit board technician was also

18 "light with an SVP of 3, or semi-skilled."  (CAR 384).   He would not have any transferable

19 skills, other than in electronics.  The ALJ provided a hypothetic which included plaintiff's age of

20 43 years, his twelfth grade education and multiple physical medical complaints; the medical

21 evidence showed Plaintiff had blindness in the left eye, but normal 20/20 vision in the right; an

22 internal medicine consultation in December 2002 showed that apart from his vision, he has no

23 functional limitations; and that "DDS agreed with CE findings with a medium residual functional

24 capacity avoiding handling large objects, using power tool or working on assembly lines."  (CAR

25 385).   The ALJ also included in the hypothetical the psychiatric CE of December 2002 with a

26 diagnosis of post-traumatic stress disorder, but no resulting limitations; the ME's testimony that

Plaintiff can follow simple job instructions; DDS decision that he could have mild impairments handling daily activities; moderate impairment in social activities as well as mild difficulties maintaining attention, concentration, persistence or pace; slight impairment in dealing with supervisors and co-workers; slight to moderate impairment in dealing with the public.  Based on those restrictions, the ALJ asked the VE to identify jobs Plaintiff could perform at the medium, light and sedentary level, where no bi-lateral visual acuity is required.

The VE testified at the medium level, Plaintiff could be an auto detailer, a laundry laborer or worker, or a dishwasher, which are all medium with an SVP of 2.  At the light level, he could be an usher in a theater, a storage facility clerk, or a mail clerk, which are all light with an SVP of 2.  At the sedentary level, he could be food order clerk, a telephone information clerk, or a charge account clerk, which are all sedentary with an SVP of 2.

Plaintiff's attorney representative then added additional limitations including being limited to only occasionally engaging in fine manipulation, limited public contact to only occasionally, only occasionally work by himself.  The VE responded that in such a situation, auto detailer would be eliminated as they use their hands all day long, as would laundry laborer, and dishwasher.  Usher would be eliminated as they work with the public.  Storage facility clerk would be eliminated as they work by themselves all the time.  Mail clerk would also be eliminated as working by himself and using the hands all day.  Food order clerk works with the public, so it would be eliminated. Telephone informational clerk and credit clerk job would remain.  If an additional limitation as to reading was added, that would eliminate the credit clerk, but the telephone informational clerk would remain.

If a standing limitation was also included in a hypothetical, to no more than two hours a day, one hour at a time, the VE testified that would eliminate the medium and light jobs except storage facility clerk.  If the hypothetical included the need for unscheduled extended breaks at least one day a week for an hour or more, then they could not do any job.  In addition, if the person had trouble getting to work and functioning effectively in the mornings, that would

1  also eliminate all jobs.

2  ### III.  STANDARD OF REVIEW

3  The court reviews the Commissioner's final decision to determine whether it is:

4  (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a

5  whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is

6  more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521

7  (9th Cir. 1996).  It is "such evidence as a reasonable mind might accept as adequate to support a

8  conclusion."  Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole, including

9  both the evidence that supports and detracts from the Commissioner's conclusion, must be

10  considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v.

11  Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's

12  decision simply by isolating a specific quantum of supporting evidence.  See Hammock v.

13  Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative

14  findings, or if there is conflicting evidence supporting a particular finding, the finding of the

15  Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).

16  Therefore, where the evidence is susceptible to more than one rational interpretation, one of

17  which supports the Commissioner's decision, the decision must be affirmed, see Thomas v.

18  Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal

19  standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th

20  Cir. 1988).

21  ### IV.  DISCUSSION

22  Plaintiff argues the ALJ erred in three ways: (1) rejecting his treating physician's

23  opinion without a legitimate basis; (2) rejecting Plaintiff's testimony without a legitimate basis;

24  and (3) failure to properly assess Plaintiff's RFC resulting in an inadequate hypothetical to the

25  VE.

26  / / /

## A.    MEDICAL OPINIONS

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals.  See Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual, than the opinion of a non-treating professional.  See id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987).  The least weight is given to the opinion of a non-examining professional.  See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4 (9th Cir. 1990).

In addition to considering its source, to evaluate whether the Commissioner properly rejected a medical opinion the court considers whether:  (1) contradictory opinions are in the record; and (2) clinical findings support the opinions.  The Commissioner may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons supported by substantial evidence in the record.  See Lester, 81 F.3d at 831. While a treating professional's opinion generally is accorded superior weight, if it is contradicted by an examining professional's opinion which is supported by different independent clinical findings, the Commissioner may resolve the conflict.  See Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995).  A contradicted opinion of a treating or examining professional may be rejected only for "specific and legitimate" reasons supported by substantial evidence.  See Lester, 81 F.3d at 830.  This test is met if the Commissioner sets out a detailed and thorough summary of the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a finding.  See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989).  Absent specific and legitimate reasons, the Commissioner must defer to the opinion of a treating or examining professional.  See Lester, 81 F.3d at 830-31.  The opinion of a non-examining professional, without other evidence, is insufficient to reject the opinion of a treating or examining professional.  See id. at 831.  In any event, the Commissioner need not give weight to any

conclusory opinion supported by minimal clinical findings.  See Meanel v. Apfel, 172 F.3d 1111,

1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion);

see also Magallanes, 881 F.2d at 751.

Here, the ALJ rejected Plaintiff's treating physician, Dr. Su's, opinion, stating:

> the undersigned is rejecting the opinion stated by Dr. Wu Su in
> November 2003.  Dr. Su's assessment is lacking in credibility
> because it is not corroborated by any objective clinical findings; is
> inconsistent with the findings of the consultative internist and the
> non-examining state agency's physician; [it is] inconsistent with
> the scant medical treatment evidence in the record; it is
> inconsistent with the recent testimony by the medical expert who
> reviewed the entire record; and it does not appear that Dr. [Su]
> treated the claimant for more than 1 or 2 occasions.  Additionally,
> it appears that this assessment is based upon the claimant's self-
> serving statements.  (CAR 253-54).

The ALJ does not specify whether he rejected Dr. Su's opinion as to Plaintiff's

physical or mental limitations.  In Dr. Su's opinion, set forth above, Plaintiff was incapable of

any level of work, both physically and mentally.  Plaintiff objects to the treatment of Dr. Su's

opinion in that as his treating physician his opinion should have been given greater weight than

the opinion of any other physician, and the ALJ failed to set forth a legitimate basis for rejecting

the opinion.

The undersigned first notes that Dr. Su's opinion is contradicted by other medical

opinions in the record.  The examining physicians found Plaintiff's abilities significantly less

limited than Dr. Su.  Dr. Bates, during the psychiatric consultative examination, found Plaintiff

not significantly impaired in any category, with the exception of his ability to adapt to the

stresses common to a normal work environment, in which he was moderately impaired.  This

opinion was based on her independent clinical findings.  The reviewing doctors similarly found

Plaintiff less limited than Dr. Su.  In addition, the ALJ's ME, whom the ALJ significantly relied

upon in his opinion, concurred with Dr. Bates and the other non-examining physicians in

assessing Plaintiff's limitations.  Specifically, as the ALJ outlined in his decision, the ME found

Plaintiff had "mild limitations in activities of daily living, mild to moderate difficulties in

maintaining social functioning, moderate to marked difficulties in maintaining concentration and pace with only 1 or 2 episodes of decompensation each of an extended duration." (CAR 252, 336). In addition, the ME's medical source statement indicated Plaintiff has "none to moderate limitations in his ability to perform work-related activities 8 hours a day for 5 days a week." (CAR 252, 341). As there were conflicting medical opinions, the ALJ properly resolved the conflict, and did so utilizing the testimony of a ME, which was consistent with, or more limiting than, the examining physician.

In addition, the ALJ set forth "specific and legitimate" reasons, even "clear and convincing" reasons, for discounting Dr. Su's opinion. Those reasons included lack of supporting objective clinical findings, inconsistency with other medical opinions, inconsistency with the scant medial treatment evidence in the record, and inconsistency with the ME's testimony.[3] The court notes the only "medical/clinical findings" Dr. Su used to support his conclusory assessment was "depression, pain, and weakness." Plaintiff points to no specific findings which support Dr. Su's significant limitations. Rather, he states generally that there were "radiological evidence, testing and clinical observations." (Pl.'s Mot. at 20). The undersigned finds that there was sufficient support for the ALJ's determination. In addition, the court agrees that Dr. Su's opinions, both physical and mental, are inconsistent with other opinions in the record and are conclusory. This is another valid reason for discounting Dr. Su's limitations. Finally, the undersigned notes that some of Dr. Su's limitations, those consistent with the other opinions in the record, were credited, such as Plaintiff's limited ability to relate to others, perform complex tasks, and concentrate. These limitations were addressed by the ALJ finding Plaintiff capable of only simple tasks and unskilled work.

---

[3] The ALJ set forth two other reasons, that Dr. Su only treated Plaintiff one or two times, and relied on Plaintiff's self serving statements. Plaintiff argues these two reasons are not supported by the record, and the undersigned agrees. However, the ALJ provided sufficient other reasons for discounting Dr. Su's opinion.

1       The undersigned finds the ALJ's rejection of Dr. Su's limitations was properly

2   supported.  The reasons the ALJ set forth in support of his rejection of the limitations were

3   specific and legitimate, as required based on the conflicting medical opinions.

4           **B.     CREDIBILITY**

5       Plaintiff alleges the ALJ improperly discredited his testimony without a legitimate

6   basis for so doing.  Defendant argues the ALJ set forth proper reasons for discrediting his

7   testimony.

8       The Commissioner determines whether a disability applicant is credible, and the

9   court defers to the Commissioner's discretion if the Commissioner used the proper process and

10  provided proper reasons.  See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996).  An explicit

11  credibility finding must be supported by specific, cogent reasons.  See Rashad v. Sullivan, 903

12  F.2d 1229, 1231 (9th Cir. 1990).  General findings are insufficient.  See Lester v. Chater, 81 F.3d

13  821, 834 (9th Cir. 1995).  Rather, the Commissioner must identify what testimony is not credible

14  and what evidence undermines the testimony.  See id.  Moreover, unless there is affirmative

15  evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not

16  credible must be "clear and convincing."  See id.; see also Carmickle v. Comm'r, 533 F.3d 1155,

17  1160 (9th Cir. 2008) (citing Lingenfelter v Astrue, 504 F.3d 1028, 1936 (9th Cir. 2007), and

18  Gregor v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006)).

19      If there is objective medical evidence of an underlying impairment, the

20  Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely

21  because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d

22  341, 347-48 (9th Cir. 1991) (en banc).  As the Ninth Circuit explained in Smolen v. Chater:

23              The claimant need not produce objective medical evidence of the
            [symptom] itself, or the severity thereof.  Nor must the claimant produce
24          objective medical evidence of the causal relationship between the
            medically determinable impairment and the symptom.  By requiring that
25          the medical impairment "could reasonably be expected to produce" pain or
            another symptom, the Cotton test requires only that the causal relationship
26          be a reasonable inference, not a medically proven phenomenon.

80 F.3d 1273, 1282 (9th Cir. 1996) (referring to the test established in Cotton v. Bowen, 799 F.2d 1403 (9th Cir. 1986)).

The Commissioner may, however, consider the nature of the symptoms alleged, including aggravating factors, medication, treatment, and functional restrictions.  See Bunnell, 947 F.2d at 345-47.  In weighing credibility, the Commissioner may also consider: (1) the claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and (5) physician and third-party testimony about the nature, severity, and effect of symptoms.  See Smolen, 80 F.3d at 1284 (citations omitted).  It is also appropriate to consider whether the claimant cooperated during physical examinations or provided conflicting statements concerning drug and/or alcohol use.  See Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002).  If the claimant testifies as to symptoms greater than would normally be produced by a given impairment, the ALJ may disbelieve that testimony provided specific findings are made.  See Carmickle, 533 F.3d at 1161 (citing Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989)).

As to Plaintiff's credibility, the ALJ stated:

> Clearly, if the undersigned were to find the testimony of the claimant to be credible, a finding of disability would be directed. However, the claimant's subjective complaints, standing alone, do not provide a basis to find "disability," and the undersigned finds that the objective medical evidence, including records from the claimant's treating physician, do not support the degree of fatigue, pain, side effects from medications, and other limitations as alleged by the claimant for the period prior to June 1, 2004 (the date the claimant was found disabled under his new application for benefits).  Although the claimant's impairments could reasonably be expected to produce some limitations, the claimant's testimony and statements of record suggest greater limitations that can be shown by the objective medical evidence.

(CAR 252).

/ / /

/ / /

28

1    The ALJ further supported his determination stating:

2    The undersigned notes the claimant has testified to both pain and
     limitations due to his anxiety disorder which he opines would
3    preclude him from being able to perform even sedentary or
     unskilled work.  However, the undersigned concludes the
4    claimant's complaints are out of proportion to the overall weight of
     the objective medical evidence of record and other factors of a non-
5    medical nature.  Therefore, the undersigned finds the claimant's
     subjective complaints cannot be relied upon and are not
6    substantially credible.

7        The undersigned notes that after the initial treatment for the
     claimant's facial injury, the claimant did not seek treatment on a
8    frequent basis complaining of severe pain in his face and or back.
     The undersigned notes that the claimant continues to be able to
9    drive and perform other chores around the home and his reports to
     his treating physician do not show significant limitations in his
10   ability to perform daily tasks.

11   (CAR 253).

12       Plaintiff argues the ALJ improperly disregarded his testimony, as to the degree of

13   his pain, mental impairments, and functional limitations, as not credible solely based on the

14   weight of objective medical evidence.  He argues this type of reasoning is eschewed by the Ninth

15   Circuit, and does not meet the "clear and convincing" standard.

16       In response, Defendant argues the reasons set forth by the ALJ are sufficient in

17   that the ALJ specifically relied on the general scarcity of treatment records, the lack of mental

18   health treatment until after the relevant period, Plaintiff's statements to his treating physicians,

19   and his statements to the consultative examiner in December 2002.

20       Here, the ALJ acknowledged that Plaintiff suffers from medically-established

21   impairments that could reasonably be expected to produce some limitations.  Therefore, his

22   subjective testimony regarding those limitations could be rejected only for clear and convincing

23   reasons.  Plaintiff argues that he provided testimony as to his pain, weakness, fearfulness of

24   strangers, depression, impaired concentration, inability to handle stress, and visual limitations.

25   The ALJ found his testimony to be largely not credible.  However, based on the RFC set forth in

26   the decision, the ALJ found some of those limitations to be substantiated.  Specifically, the

1   decision set forth that Plaintiff is limited in his abilities due to his vision, and his ability to lift

2   and carry is somewhat diminished in that the ALJ determined he is only capable of medium

3   work.  The ALJ further found Plaintiff only capable of performing unskilled work, which he

4   determined satisfied Plaintiff's limitations regarding working with others as "[u]nskilled work

5   usually requires working more with things than with people." (CAR 253).  The ALJ's

6   determination that he is limited to unskilled, simple work also took into consideration Plaintiff's

7   abilities to concentrate and handle stress.  Therefore, the only two limitations the ALJ discredited

8   were the amount of pain Plaintiff testified to and the effects of his depression or anxiety.

9          As to Plaintiff's pain testimony, the ALJ supported his determination on the basis

10  of Plaintiff's lack of treatment on a frequent basis for pain in either his face or his back, his

11  continued ability to drive and perform chores around the house, and his reports to his treating

12  physician.  In addition, the undersigned notes the ALJ partially credited Plaintiff's back pain

13  limitations, but noted that there were no medical findings showing any motor loss, reflex

14  changes, or neurological deficits.  As stated above, a finding of inconsistent statements,

15  unexplained lack of treatment, and inconsistent daily actives are sufficient reasons for

16  discrediting a claimant's testimony.  See Smolen, 80 F.3d at 1284.  In addition, "[c]ontradiction

17  with the medical record is a sufficient basis for rejecting the claimant's subjective testimony."

18  Carmickle, 533 F.3d at 1161 (citing Johnson v. Shalala, 60 F.3d 1428, 1434 (9th Cir. 1995)).

19  The undersigned finds the reasons set forth by the ALJ to reject Plaintiff's pain testimony were

20  clear and convincing and supported by the record.  As the ALJ noted, upon examination Plaintiff

21  was found to have no physical limitations except due to his vision, and he reported to the

22  consulting psychiatric physician a wide range of daily activities in December 2002.

23         As to the limitations caused by Plaintiff's anxiety and/or depression, the ALJ

24  noted the lack of treatment prior to 2003 and that he reported improvement in his symptoms upon

25  receiving treatment and medication.  Plaintiff argues that his improvement noted in his medical

26  records in 2005 are irrelevant as that improvement was after the applicable time frame this case

is addressing, specifically March 8, 2002, through June 1, 2004.  However, although the improvement noted by the ALJ occurred after June 2004, the court cannot find it inapplicable as treatment was not sought until after the relevant time period.  The court also notes that Plaintiff was first referred for psychiatric treatment immediately following his assault as is noted in the discharge summary from U.C. Davis in March 2002.  Therefore, his argument that he should not be penalized for failing to appreciate the need for mental health treatment is somewhat contradicted by that referral.  Plaintiff only points to one complaint to his treating physician that he is suffering from some mental problems.  Finally, as directed by the Appeals Council, the ALJ obtained the assistance of a mental health medical expert, Dr. Walter, in addition to the CE previously utilized, in order to assess Plaintiff's mental capacity.  The limitations the ALJ found were consistent with the ME's testimony, and as set forth above, were appropriately addressed.  The issues raised relative to Plaintiff's anxiety and depression were properly addressed in the RFC.

The undersigned therefore finds the reasons set forth in the ALJ's decision for discrediting Plaintiff's testimony were clear and convincing, and supported by the record.[4]

## C.    RESIDUAL FUNCTIONAL CAPACITY

Finally, Plaintiff alleges the ALJ erred in assessing his RFC, resulting in an inadequate hypothetical to the VE.  Defendant argues the RFC was supported by the record, and the hypothetical questions included all of Plaintiff's limitations.

Residual functional capacity is what a person "can still do despite [the

---

[4]    While not included in Plaintiff's argument, the court notes that there appears to be some language barrier issues in this case.  During the first proceedings, including the first administrative hearing and the consultative examinations, Plaintiff was not provided with a Hmong interpreter.  However, at the second administrative hearing and at his mental health treatment appointments beginning in 2004, Plaintiff was provided with an interpreter.  It is unclear in the record before this court whether some of the inconsistencies in the record, especially those noted in his report of abilities to the CE in 2002 and those he testified to at the hearing, could be explained due to a language barrier.  There is no such argument before this court, and not enough information in the record to make this determination.  However, the court notes that as a possible explanation for some of the inconsistencies.

1    individual's] limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a) (2003); see also Valencia v.

2    Heckler, 751 F.2d 1082, 1085 (9th Cir. 1985) (residual functional capacity reflects current

3    "physical and mental capabilities").  Thus, residual functional capacity describes a person's

4    exertional capabilities in light of his or her limitations.

5            Hypothetical questions posed to a vocational expert must set out all the

6    substantial, supported limitations and restrictions of the particular claimant.  See Magallanes v.

7    Bowen, 881 F.2d 747, 756 (9th Cir. 1989).  If a hypothetical does not reflect all the claimant's

8    limitations, the expert's testimony as to jobs in the national economy the claimant can perform

9    has no evidentiary value.  See DeLorme v. Sullivan, 924 F.2d 841, 850 (9th Cir. 1991).  While

10   the ALJ may pose to the expert a range of hypothetical questions based on alternate

11   interpretations of the evidence, the hypothetical that ultimately serves as the basis for the ALJ's

12   determination must be supported by substantial evidence in the record as a whole.  See Embrey v.

13   Bowen, 849 F.2d 418, 422-23 (9th Cir. 1988).

14           Plaintiff argues the ALJ's RFC failed to include all of his limitations in the

15   hypothetical questions posed to the VE.  Specifically, he argues the ALJ failed to include his

16   limitations regarding maintaining concentration, persistence and pace, as well as his limitations

17   to stress and interacting with the public.  Defendant argues the ALJ's RFC properly included all

18   of his limitations and the hypotheticals posed were adequate.

19           As set forth above, the RFC the ALJ adopted included Plaintiff's limitations as to

20   his ability to interact with the public, tolerate stress, and his abilities regarding concentration,

21   persistence and pace.  As to Plaintiff's ability to interact with the public, the ALJ addressed that

22   by finding him limited to unskilled work, which he noted requires working more with things than

23   people.  In addition, the hypothetical propounded to the VE included this limitation.  As to

24   Plaintiff's ability to tolerate stress and concentrate, this also was addressed in the ALJ's RFC by

25   finding that Plaintiff was only able to tolerate simple, unskilled work.  As the ME testified, due

26   to his concentration and attention, he would not be able to handle complex activities, but could

handle simple ones.

Similarly, the hypothetical the ALJ set forth to the VE included these limitations. The ALJ specifically requested the VE consider a hypothetical person who was limited to simple job instructions due to concentration impairments, mild difficulties maintaining attention, concentration, persistence of pace, and a slight impairment in dealing with supervisors and co-workers, but a moderate impairment in dealing with the public.  While the undersigned finds the hypothetical posed to the VE was not very concise or eloquent, the impairments it included were supported by the record as a whole.

### V.  CONCLUSION

Based on the foregoing, the court concludes that the Commissioner's final decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS HEREBY ORDERED that:

1.      Plaintiff's motion for summary judgment (Doc. 20) is denied;

2.      Defendant's cross-motion for summary judgment (Doc. 22) is granted; and

3.      The Clerk of the Court is directed to enter judgment and close this file.


DATED: March 29, 2010

_____
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE